A98A0953. IN THE INTEREST OF K. S. W. et al., children.
(503 SE2d 376)

McMURRAY, Presiding Judge.

On April 12, 1996, the Polk County Department of Family & Children Services ("DFACS") petitioned the Polk County Juvenile Court to terminate the parental rights of appellant-defendant natural father, and his wife, the natural mother, in the three minor children, K. S. W., K. L. W., and T. V. W., alleging the "parents have not completed their case plan[, and] have not maintained contact with the children." The evidence, construed to uphold the determination of the juvenile court, revealed the following: Theodore Brand, M. D., a pediatric surgeon first saw K. S. W. on March 17, 1991, while the then six-month-old infant was in the Intensive Care Unit at Scottish Rite Hospital. "Upon examination she was seen to be an awake alert child and she had a markedly swollen and edemitis head and face, with ecchymosis [(bruising)] in swelling of the cheeks and especially around the edges of her mouth. . . . There was a big bruise on the back of her head, . . . about two centimeters or nearly an inch in diameter. . . . There were various scratches and abrasions of the lower extremities. . . ." Various blood tests were "unremarkable except for a CPK level, which was markedly elevated. That's an indicator of muscle injury and that enzyme level will go very high with severe muscle injury or significant muscle injury. . . . [X-rays]

revealed nondepressed skull fracture[, and] a healing fracture in her right clavicle, not a current fracture, . . . but one that was within the stages of healing already." In Dr. Brand's opinion, the "most likely cause for the injury was an electrical wire injury which caused burns and swelling around the mouth. . . . [A]s the injury evolved over several days it became apparent that what we were looking at at the corners of the mouth were electrical burns. They have a very typical appearance of an electrical burn and it's seen very commonly when a child chews or bites on a wire that has current going through it. . . . [Dr. Brand felt the] injury on the back of her scalp may also be part of the same electrical injury, like a grounding point. . . ." It was further Dr. Brand's opinion that these were "neglectful injuries, [in that,] no child at that age should be allowed to chew on an electrical wire. . . . [T]he fact that she doesn't have any teeth means she probably couldn't have chewed through the cord herself, [and] it's possible it was a frayed cord she got her hands on. . . ." Although "clavicle fractures are very common birth injuries and many babies break their clavicle during delivery[, Dr. Brand] would expect at six months that it would have been healed a lot more than it was . . ., so it probably was an injury received at some time after birth and a child of that age cannot break their own clavicle without being dropped or struck or something like that." Dr. Brand did not have a medical opinion whether these injuries were forced or accidental.

On May 10, 1991, the defendant natural father entered a negotiated guilty plea to a single count of cruelty to children, and was sentenced to 15 years on probation, during which probationary period, defendant was "to obtain [a] GED[, and] attend Parenting Class as directed by the Probation Office." In pleading guilty, the defendant natural father admitted he did "unlawfully and maliciously by their criminal negligence cause [K. S. W.], a child under 18 years of age cruel and excessive physical pain . . . [by allowing] said child to have access to frayed, live electrical cords and [by allowing] said child to sleep in a crib which had a number [of] siderails missing which allowed said child to fall out of said crib repeatedly, which resulted in various injuries to said child including but not limited to skull fractures and electrical burns. . . ."

Nancy Melton was the DFACS caseworker for the children from March 1991 to October 1994. The defendant natural father and his wife, the natural mother, showed some initial success in attempting to meet the goals of the first six-month case plan, in that they did visit with their children and attended a parenting class. A subsequent case plan established the goals that defendant and his wife "will lead a lifestyle that is free of alcohol and drugs; . . . will attend mental health counseling as deemed necessary by their counselor; . . . will maintain a stable home and regular employment; [and] will

visit with their children on a regular basis. . . .." But the natural mother "was laid off from her job at Tip Top because they found marijuana in her system during a routine drug test." The parents had been requested to attend "AA" meetings, which had not been completed. In Nancy Melton's opinion, defendant and his wife, the natural mother, were not able to maintain a stable home and regular employment. Similar goals were identified in subsequent case plans but by October 1994, "they had not requested any visits in the past six months. [T]hey had moved around town at that time. They had not attended AA; had not completed the GED; they had scheduled a counseling appointment but did not attend. And [defendant] had started an out-patient program [for alcohol] but had not completed it."

In May 1993, "there was a problem during one of the visits. When [Nancy Melton] went to pick the children up, [defendant] had become upset and he and [his wife] had had an argument, and he had started throwing things and yelling, breaking windows, and the police had to be called while the children were there. And at that time [defendant] was taken to [jail] . . . for disorderly conduct and he tested positive for marijuana."

Patti Stewart, the DFACS social services case manager thought that adoption was in the best interests of the children, who have been in foster care since March 1991, "because it's been long enough. [The parents] haven't done anything or made any progress. They've [both] been in and out of jail. . . . [The children need] some type of permanency, and [she] would not recommend any more time." Specifically, "[t]wo of the children have been moved from one foster home to another. [T. V. W.] is having a lot of — his behavior problems are getting worse. . . . We would not want to separate those two children because they have been together, and [DFACS] would be looking at an adoptive placement for them together. . . ." Patti Stewart had no contact with defendant since she took over the case. Defendant's last documented visit was in August 1996.

Defendant has been incarcerated since March 1997 because his probation was revoked for five years. In 1994, defendant and his wife, the natural mother, separated, and defendant stayed with another woman or with friends "one or two weeks, in and out." At present, defendant is self-employed as a house painter. His income varies from "a hundred dollars one week and seven or eight hundred the next." He "checked into [an out-patient drug and alcohol counseling program in Thomasville] and went to a couple of meetings, and then . . . just quit going." Although the natural mother admitted her own alcohol problems caused conflicts between her and defendant, she did not believe defendant had an alcohol or drug problem. Jean Campbell, the natural mother's grandmother, described visits at her home

between defendant and the children, who "were on Cloud 9 to see [their parents]. . . ." But Jean Campbell's home has "one bedroom, a living room, and a smaller room, and then a bath, and a kitchen." Five adults and one child already reside there. They "have some things to make beds in the living room and the carpet, like sleeping bags and like that." Ms. Campbell conceded there is no room in her house for three more children. Defendant has not filed a tax return in the last 12 years, and admitted he has not paid any child support since the children have been in the care of DFACS. Nevertheless, he spent $100 on a "Chinese SKS 7.62. It is an assault rifle, but [defendant is] a frequent deer hunter and they make excellent deer rifles," knowing he "wasn't supposed to own a[ny] firearm."

The associate juvenile judge ordered termination of both parents' rights in the three children. After de novo consideration by the Polk County Juvenile Court Judge, it was again determined that the parental rights of both parents should be terminated, and only the defendant natural father appeals from that order. In two related enumerations, defendant challenges the sufficiency of the evidence to terminate his parental rights. *Held*:

1. "The standard of review on appeal from a termination of parental rights is whether, after reviewing the evidence in the light most favorable to the [juvenile court's disposition], any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. [Cit.] On appeal, '(t)his Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the [juvenile] court's factfinding and affirm unless the appellate standard is not met.' [Cit.]" *In the Interest of R. D. S. P.*, 230 Ga. App. 205 (495 SE2d 867).

"In considering the termination of parental rights, the court shall first determine whether there is present clear and convincing evidence of parental misconduct or inability. . . . If there is clear and convincing evidence of such parental misconduct or inability, the court shall then determine whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child . . . including the need for a secure and stable home." OCGA § 15-11-81 (a).

Termination of parental rights based on parental misconduct and inability may be authorized by the juvenile court's determinations that the child is deprived due to lack of proper parental care or control, subsistence, or education as required by law or as necessary for the child's physical, mental, or emotional health, or morals (OCGA § 15-11-2 (8)); that such deprivation is likely to continue; and that the continued deprivation will cause serious physical, mental, emotional, and moral harm to the children. OCGA § 15-11-81 (b) (4)

(A) (i) through (b) (4) (A) (iv). Lack of proper parental care or control may be shown by conviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship, OCGA § 15-11-81 (b) (4) (B) (iii), and also by evidence of past physical, mental, or emotional neglect of the child or of another child by the parent. OCGA § 15-11-81 (b) (4) (B) (v). In addition, where the child is not in the custody of the parent whose rights are in issue, the juvenile court shall consider whether lack of proper parental care and control is demonstrated by proof that the parent, without justifiable cause, failed significantly for a period of one year or longer prior to the filing of the petition to terminate parental rights, to communicate or make a bona fide attempt to communicate with the child in a meaningful supportive way, or fail significantly to comply with a court-ordered plan designed to reunite the child with the parents. OCGA § 15-11-81 (b) (4) (C) (i) and (b) (4) (C) (iii).

2. Defendant first contends the evidence is insufficient to show any deprivation caused by defendant was likely to continue or would not likely be remedied. We must disagree.

The evidence is overwhelming and uncontested that K. S. W., K. L. W. and T. V. W. are deprived due to lack of proper parental care and control. "In determining whether conditions of deprivation are likely to continue, the [juvenile] court may consider the past conduct of the parent. [Cit.] In this case, there [is] not only evidence of past unfitness, there [is] present unfitness also. [Cit.] While imprisonment alone does not automatically authorize a termination of parental rights, it will support such a ruling when adequate aggravating circumstances are shown to exist. [Cit.]" *In the Interest of R. D. S. P.,* 230 Ga. App. 205, 207, supra.

Defendant's imminent incarceration under probation revocation (and possibly a new felony sentence for possession of a firearm by a convicted felon) will have a demonstrable negative effect on the parent-child relationship. In aggravation of this form of parental inability, the following circumstances support termination of defendant's parental rights: These children have been in foster care since 1991, when defendant pleaded guilty to criminal neglect of the infant girl, K. S. W. Between that time and the September 1996, evidentiary hearing, defendant's whereabouts (when he was not incarcerated) were erratic and frequently unknown to DFACS caseworkers. Visitation by defendant (as opposed to his wife) was limited to birthdays. He has never supported his children financially, and has made no bona fide effort to communicate with them, or maintain a meaningful and supportive parental role. During the five years since he was first placed on probation, he was unable to find time to complete a general equivalency diploma, a condition of probation as well as part of the

case reunification plans. There is no evidence that defendant, who has never paid child support but can spare $100 for a Chinese automatic weapon, will be any better provider for his children in the future. Thus, pretermitting whether defendant's itinerant way of life or limited economic circumstances rendered it impracticable to maintain a stable single *residence*, the evidence authorized the juvenile court's determination that defendant was unable to offer a safe and stable *home environment* for his three children, and that this situation was likely to continue. *In the Interest of C. W. D.*, 232 Ga. App. 200 (1) (501 SE2d 232).

3. The same circumstances that authorized the juvenile court's determination that these children were deprived due to lack of proper parental control or to parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children. OCGA § 15-11-81 (b) (4) (A) (iv); *In the Interest of D. T.*, 221 Ga. App. 328, 329 (1) (471 SE2d 281).

*Judgment affirmed. Blackburn and Eldridge, JJ., concur.*

DECIDED JUNE 29, 1998.

*Charles E. Pinkard, Jr.*, for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Dennis R. Dunn, Senior Assistant Attorneys General, Shalen A. Sgrosso, Stephanie M. Baldauff, Assistant Attorneys General, Gammon & Anderson, W. Wright Gammon, Jr., James S. Astin, Johnny R. Pannell*, for appellees.