A03A0231. IN THE INTEREST OF J. J. et al., children.
(575 SE2d 921)

BLACKBURN, Presiding Judge.

S. J., natural mother of J. J., M. J., K. J., and D. J.,[1] appeals the termination of her parental rights in her children, arguing that the evidence was insufficient to support the termination of rights.[2] For the reasons set forth below, we affirm.

The standard of review on appeal from a termination of parental rights is whether, after reviewing the evidence in the light most favorable to the juvenile court's disposition, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. On appeal, this Court neither weighs evidence nor determines the credibility of witnesses; rather,

---

[1] A fifth child, C. J., is no longer a party to the action having reached the age of majority at the time of the termination hearing.

[2] The whereabouts of J. J., the natural father, have been unknown for two years; he is not a party to this appeal.

we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

(Citation and punctuation omitted.) *In the Interest of K. S. W.*[3]

Viewed in a light most favorable to the juvenile court's disposition of this case, the record shows that the Henry County Department of Family and Children Services (the "Department") first received a referral on S. J.'s family in July 1999, based on a report that the father had sexually abused C. J. and that S. J. had beaten C. J. when she reported the abuse to her. The Department investigated the referral and found that the utilities had been turned off; the family was about to be evicted; there was little food in the home; and the home itself was in a deplorable condition. S. J. was in prison for writing bad checks, and the father refused to work. There were allegations of emotional abuse and physical abuse by both S. J. and the children's father. There were also allegations of sexual abuse of some of the children by the father, and S. J.'s failure to protect C. J. from sexual abuse. Also, there was evidence of medical neglect and substance abuse.

On August 17, 1999, the Department obtained emergency custody of the children. The Department filed a deprivation petition on August 20, 1999, and an adjudicatory hearing was held on August 30, 1999. The juvenile court found the children to be deprived on the basis of S. J.'s current incarceration and inability to provide and care for the children and on the father's unemployment and inability to provide for the children. S. J. stipulated that she had to address issues of neglect, physical abuse, substance abuse, failure to protect the children, and habitual criminal activity before reunification with her children could be achieved.

On September 10, 1999, the Department implemented S. J.'s reunification case plan. That plan required S. J. to: resolve all criminal charges; be alcohol and drug free; maintain contact with her children; cooperate and maintain contact with the Department; be financially stable; obtain a place to live large enough for the family; and establish a stable and secure environment.

On October 25, 1999, the Department developed another case plan. A citizen panel reviewed the plan on November 4, 1999, and recommended that the children remain in foster care. S. J. appealed the panel's recommendation; the juvenile court entered an order amending the panel report to allow S. J. two supervised visits with her children each month for as long as she was incarcerated in the county jail.

---

[3] *In the Interest of K. S. W.*, 233 Ga. App. 144, 147 (1) (503 SE2d 376) (1998).

On May 11, 2000, a citizen panel reviewed S. J.'s third case plan and received reports that S. J.'s visitations with her children were chaotic and unruly; the children fought with each other; S. J. discussed inappropriate topics with J. J. and C. J. while ignoring the other children; and S. J. used profanity with the children. The panel recommended termination of the father's parental rights and no reunification with S. J. for the next six months.

In November 2000, the Department implemented S. J.'s fourth case plan. A panel reviewed the plan on November 9, 2000; noted that S. J. had not achieved the goals of, or fulfilled, the case plan; and recommended termination of S. J.'s parental rights.

Because S. J. failed to comply with the case plans, the Department filed a petition to terminate S. J.'s parental rights to the children on April 25, 2001. The juvenile court held a hearing on the termination petition on August 24, 2001. Based on the evidence presented at the hearing, the juvenile court entered an order terminating S. J.'s parental rights to J. J., M. J., K. J., and D. J.

> A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.

(Footnote omitted.) *In the Interest of V. M. T.*[4]

S. J. argues in a single enumeration of error that there was insufficient evidence to support the court's findings that: deprivation of the children was likely to continue or not be remedied; the children were likely to be seriously harmed by continuing deprivation; and it was in the children's best interests that her parental rights be terminated.

The first factor in the determination of parental misconduct or inability, whether the children were deprived, has been satisfied. The juvenile court entered an unappealed deprivation order on September 9, 1999, nunc pro tunc August 30, 1999, which was extended by

---

[4] *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000).

subsequent unappealed orders. Accordingly, S. J. is bound by the juvenile court's finding of deprivation. *In the Interest of E. C.*[5]

The evidence was also sufficient to support the juvenile court's determination that the children's deprivation was caused by a lack of proper parental care or control by S. J. In cases

> where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: [t]o provide for the care and support of the child as required by law or judicial decree; and [t]o comply with a court ordered plan designed to reunite the child with the parent or parents.

OCGA § 15-11-94 (b) (4) (C) (ii)-(iii).

Viewed in a light most favorable to the juvenile court's determination that the children's deprivation resulted from the lack of proper parental care or control, the record shows that S. J. did not pay any child support for her five children during the two years preceding the termination hearing. S. J. attempts to justify her failure to support her children by noting that no child support order was ever entered against her. "A parent, however, has a statutory duty to support her children, with or without a court order. OCGA § 19-7-2." *In the Interest of R. W.*[6] S. J. has inexcusably failed to live up to this duty, leaving the Department to support her children for two years. See id.

S. J. has also failed to comply in any meaningful way with the goals set for her in the reunification case plans. The first goal in S. J.'s case plan was to resolve all criminal charges against her. This she was to do by, among other things, serving all sentences, paying all fines, and abiding by the terms of probation.

S. J. has been incarcerated on various and numerous fraud and theft charges for approximately fifteen months of the two-year period in which her children have been in foster care, and thus has been serving her sentences in compliance with the case plan. However, the record shows that she has failed to pay fines imposed as part of her criminal sentences. Further, at the time of the termination hearing, she was incarcerated on a violation of probation, having failed to report as instructed on numerous dates, to pay fines, and to perform

---

[5] *In the Interest of E. C.*, 225 Ga. App. 12, 15 (482 SE2d 522) (1997).
[6] *In the Interest of R. W.*, 248 Ga. App. 522, 526 (2) (546 SE2d 882) (2001).

community service. Though S. J. testified that she expected to be released to a work release program a few days after the hearing, the work release supervisor contradicted her by testifying that S. J. would not be participating in the work release program but instead would remain incarcerated until December 2001, because she was subject to extradition to Missouri on charges of food stamp fraud.

The second goal of S. J.'s case plan was financial stability, which she would take steps toward achieving by obtaining full-time employment, submitting copies of her paycheck stubs on a monthly basis, and paying child support. Despite S. J.'s assertions that she had worked for short periods, testimony at the hearing shows that S. J. never presented the Department with any proof that she had obtained employment in the months when she was out of jail. She never furnished any record of employment or paycheck stubs to the Department, and the Department had no record of her employment in its files.

Even if S. J. were employed as she maintained she was, such employment was for brief periods, indicating an unwillingness to hold a full-time job. S. J. was out of jail for the seven-month period from April to October 2000. She testified that after being released in April 2000, she worked at UPS for six weeks. The Department, however, submitted an affidavit from an employee of the UPS Legal Department stating that there was no record that S. J. had ever worked for UPS.

S. J. also testified that after leaving UPS, she obtained work at Eckerd's but quit work in August after only three months of employment. She did not have a full-time job from August 2000 until she was once again incarcerated in November 2000.

S. J. was out of prison for two months in 2001. She did not secure full-time employment during this two-month period. Beyond all of this, as noted above, S. J. never, in the two years prior to the termination hearing, paid any support for her children.

S. J.'s case plan required her to be alcohol and drug free. In furtherance of this goal, S. J. was to: complete a drug/alcohol assessment through the Henry County Counseling Center by January 1, 2000; seek individual counseling and follow all recommendations of the clinician; submit to random drug screens; and sign a release of information form so that the caseworker could communicate with treatment providers.

The record shows that S. J. did obtain a drug/alcohol assessment as required in the case plan, but waited for 14 months after the case plan was implemented to do so. S. J. made no effort to seek counseling. The Department requested five random drug screens over the two-year period. S. J. submitted to four of the screenings, one of which was positive. She failed to report for the other screening.

Another goal of the case plan was for S. J. to cooperate and keep in contact with the Department. Among other things, she was to keep the case manager advised of her address, phone number, place of employment, and any other relevant information. The record shows that from November 2000 through April 2001, the Department was aware that S. J. was incarcerated, but S. J. never informed them where she was in custody. In June 2001, S. J. informed the Department that she was living with her mother; the Department subsequently learned that this information was false and that S. J. had been living in a motel. Finally, S. J. did not inform the Department when she was arrested in June 2001 and incarcerated on July 24, 2001. As a step toward the goal of cooperating and keeping in contact with the Department, S. J. was also to sign releases so that her case manager could communicate with counselors and therapists about her case, but, having never sought counseling, S. J. obviously did not comply with this step of the plan.

Another goal of S. J.'s case plan was that she maintain contact with her children. Testimony showed that of 38 scheduled visitations with her children, S. J. attended only half of them. Even when she met with her children as scheduled, the visits were "chaotic and unruly," with S. J. discussing inappropriate subjects with two of her children while ignoring the others. Indeed, S. J. was often so argumentative and angry during the visits with the children that C. J., her oldest daughter, wrote a letter to the judge asking that she not be required to visit with her mother.

Establishing a stable and secure environment was yet another goal set forth for S. J. in the case plan. As part of this goal, S. J. was to have a psychological evaluation completed, and this she did, though nearly ten months after the date specified in the plan. The plan also recommended psychiatric treatment and required her to follow all recommendations of her therapist. The therapist recommended parenting classes and individual, group, and family psychotherapy. S. J. was also required to participate in a domestic violence group for 12 consecutive sessions. S. J. failed to comply with most of these recommendations, attending only two of fifteen parenting classes.

S. J. was also required to obtain stable and adequate housing for her children and herself. This she also failed to do.

Taken together, these facts provide sufficient evidence that S. J. caused her children's deprivation. The second factor is satisfied.

The evidence adduced at the termination hearing also supports the juvenile court's determination that the children's deprivation is likely to continue.

> Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue. The court was entitled to infer from the evidence that, despite the best efforts of [the Department] and many other social workers and charities, the same pattern of deprivation would continue if the children were reunited with their mother.

(Punctuation omitted.) *In the Interest of R. W.*, supra at 524-525 (1). In finding clear and convincing evidence that the deprivation is likely to continue, we call special attention to the fact that criminal charges are pending against S. J. in Missouri, and that the Missouri authorities have indicated that they intend to seek extradition of S. J., as well as to the fact that S. J. presented no evidence that she would be able to provide adequate housing for her children and herself when she is released from incarceration. We also take note of C. J.'s testimony that her mother did not take responsibility for her children's being in foster care and, instead, blamed the Department for her circumstances, even while she herself has made practically no effort to address her problems and follow the steps outlined in the reunification case plan. These considerations bolster the juvenile court's conclusion that the deprivation of the children is likely to continue.

As to S. J.'s contention that there was insufficient evidence to support a finding that the children were likely to be seriously harmed by continuing deprivation,

> [t]he same circumstances that authorized the juvenile court's determination that these children were deprived due to lack of proper parental control or to parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children.

*In the Interest of K. S. W.*, supra at 149 (3). In this case, the evidence presented to the juvenile court strongly supports a finding that S. J. is physically, emotionally, and financially unable to manage her own life, even without the added burden of young, dependent children, and we find no basis for believing that S. J. will be prepared in the near future to care for her children and provide for their needs. *In the Interest of E. C.*, supra at 17.

Finally, the record supports the juvenile court's finding that termination of S. J.'s parental rights is in the best interests of the chil-

dren. "The same factors that show parental misconduct or inability can support a juvenile court's finding that termination of parental rights is in the [children's] best interest[s]." *In the Interest of V. M. T.*, supra at 736-737 (3). Given S. J.'s failure to follow her reunification case plan, her violation of probation at a time when she faced termination of her parental rights, and the probability of extradition to Missouri to face criminal charges, it is clear that the juvenile court was authorized to conclude that the best interests of S. J.'s children would be served by terminating their mother's parental rights and keeping them with foster families.

*Judgment affirmed. Ellington and Phipps, JJ., concur.*

DECIDED JANUARY 9, 2003.

*Mathias Skowranek*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Stephanie B. Hope, James T. Chafin III*, for appellee.