A03A0880. IN THE INTEREST OF N. L. et al., children.
(581 SE2d 643)

BLACKBURN, Presiding Judge.

Appellant, natural mother of N. J. and N. L., appeals the termination of her parental rights in her children, arguing that there was no clear and convincing evidence supporting the juvenile court's termination of those rights. For the reasons set forth below, we affirm.

> The standard of review on appeal from a termination of parental rights is whether, after reviewing the evidence in the light most favorable to the juvenile court's disposition, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. On appeal, this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

(Citation and punctuation omitted.) *In the Interest of K. S. W.*[1]

Viewed in the light most favorable to the juvenile court's disposition of the case, the record shows that the Lamar County Department of Family and Children Services (the "Department") first became involved with appellant and her children on June 10, 1999, after the Department received a referral from Spalding County that C. H., appellant's husband, had beaten N. L. "pretty bad all over his

---

[1] *In the Interest of K. S. W.*, 233 Ga. App. 144, 147 (1) (503 SE2d 376) (1998).

body." On the same day, appellant went to the Department and reported that her husband had abused N. L.

Appellant and an employee of the Department took N. L. to a doctor for a physical examination; the child had multiple bruises but no broken bones. C. H. admitted to Department employees that he had beaten the child while high on cocaine.

The Department opened a child protective services case on the family, developed a safety plan for appellant, and funded in-home therapy services. Under the case plan, appellant was required to manage her own mental health needs, learn and demonstrate non-physical forms of discipline for N. L., and ensure the safety of her children at all times by, among other things, prohibiting any further contact between her children and C. H.

On July 13, 1999, appellant voluntarily placed her children with the Department because, in violation of the case plan, she had allowed C. H. back into the home. The Department's investigation revealed physical abuse of the children by C. H. and emotional abuse by appellant.

A new reunification case plan was developed for appellant. This plan required appellant to: manage her own mental health needs; visit with her children; find and maintain a stable home; learn and demonstrate positive ways of disciplining her children; and protect her children.

In early August 1999, appellant quit her job. Shortly thereafter, the in-home therapy service reported that appellant had been beaten by her husband and that no progress was being made in the home because appellant would not separate from him. Later in August, appellant was involved in a domestic disturbance with C. H. On October 5, 1999, appellant and her husband were involved in another domestic disturbance which ended only after the police were called and he was arrested for battery.

On January 15, 2000, another reunification case plan was ordered for appellant. It set forth the same goals contained in the previous case plan. In July 2000, the Department urged the approval of a nonreunification plan for the children with a goal of adoption. The court rejected the request and ordered the Department to continue to work toward reunification of appellant and her children.

On June 20, 2001, the Department and appellant agreed on a new case plan with narrowed goals. That case plan required appellant to continue to maintain a safe, stable home for her family, cooperate with the Department, and display the ability to meet her children's special needs. Appellant followed this case plan and began having unsupervised visits with her children. The Department filed a motion to transfer custody of the children to her on October 2, 2001. However, the Department moved to dismiss the motion to transfer

custody when it was learned that N. J. was injured while in appellant's custody for an unsupervised visit. The child had burns on his mouth, face, pallet, tongue, and lips; a doctor who examined the child described the burns as "a bad, bad injury."

A hearing on the motion to dismiss was held on November 7, 2001. The juvenile court found that appellant had been involved in a domestic violence incident on August 11, 2001. It also found that on August 31, 2001, an emergency room doctor examined N. J. following a sexual abuse allegation. N. J. indicated to the doctor that his "wee-wee" had been hit or injured and that he was having problems urinating. A pediatrician also examined N. J.; this doctor was told by N. J. that "[mother's nickname]" had pulled his "wee-wee." The juvenile court also took note of the burn injury to N. J.'s mouth. Based on these facts, the court dismissed the motion to transfer custody and also "disallowed and stopped" appellant's unsupervised visits with the children.

On November 16, 2001, after hearing extensive evidence from the children's medical care providers, the court approved nonreunification case plans for both N. J. and N. L. At a January 16, 2002 hearing, which appellant did not attend, the juvenile court entered a nonreunification order which was never appealed.

The Department filed a petition to terminate the parental rights of appellant and the children's fathers on March 25, 2002. The juvenile court conducted a hearing on the Department's termination petition on June 19, 2002. The court heard four witnesses, including appellant, and also took judicial notice of the nonreunification order entered previously in the case and the testimony of the medical doctors who testified at the nonreunification hearing about the injuries N. J. received while in appellant's custody. Based on this evidence, the juvenile court entered an order terminating the parental rights of appellant and the children's fathers.

A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and

moral condition and needs, including the need for a secure, stable home.

(Footnote omitted.) *In the Interest of V. M. T.*[2]

In a single enumeration of error, appellant argues that there was no clear and convincing evidence: (1) of parental misconduct or inability that caused her children's deprivation; or (2) that deprivation was likely to continue or cause serious physical, mental, emotional, or moral harm to the children.

The first finding establishing parental misconduct or inability, i.e., whether the children were deprived, has already been made. On November 20, 2001, the juvenile court entered orders finding the children to be deprived and appellant, having failed to appeal those orders, is bound by the juvenile court's findings of deprivation. *In the Interest of E. C.*[3]

The next step is to determine whether there was clear and convincing evidence that a lack of proper parental care or control is the cause of the deprivation. In cases in which

> the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: [t]o provide for the care and support of the child as required by law or judicial decree; and [t]o comply with a court ordered plan designed to reunite the child with the parent or parents.

OCGA § 15-11-94 (b) (4) (C) (ii)-(iii).

Viewed in a light most favorable to the juvenile court's finding that appellant's failure to provide proper parental care or control was the cause of the children's deprivation, the record shows that though appellant was employed for most of the three-year period prior to the termination hearing, she paid little, if any, child support.

The record also shows that appellant was, from the beginning, in violation of her case plans. The first plan, a safety plan, required appellant to ensure the safety of her children, primarily by seeing that C. H. did not come into contact with them. Shortly after the plan was developed, the Department learned that C. H. was once again in appellant's home. When employees of the Department went to the

---

[2] *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000).
[3] *In the Interest of E. C.*, 225 Ga. App. 12, 15 (482 SE2d 522) (1997).

home to investigate, appellant told them that she was going to be evicted from her home because she had used part of her rent money to bail C. H. out of jail. Employees of the Department told her that they might be able to help her pay her rent with agency funds if she had C. H. move out of the home. Appellant refused the offer, preferring to have C. H. stay with her rather than having the children, who were staying in her sister's home, return to her home.

Appellant's exposure of her children to incidents of domestic violence also demonstrates an indifference to their safety. Particularly disturbing are the unexplained injuries N. J. suffered, both the serious burns to his mouth and what appears to have been sexual abuse, while in the care of appellant.

The Department expended approximately $10,000 in an attempt to provide services to appellant. Among the services provided was an in-home therapist to help her achieve the goals of the case plans. The therapist, however, reported to the Department that she was making no progress with appellant because appellant chose to continue her relationship with C. H. by having him in her home. The therapist stopped working with appellant because she showed no signs of ending her relationship with C. H. or of obtaining employment.

Appellant was required to maintain a safe, stable home, visit her children, and cooperate with the Department. Appellant missed visits with her children and did not call to notify the Department about her employment, where she was living, and why she had missed visits with the children. At the time of the termination hearing, appellant was living in a motel and had taken no steps toward securing a stable home for the children. She had no savings and had contributed nothing to child support. She was not cooperating with the Department and had not told anyone at the Department where she was living. She had made no effort to start or request a reunification plan. In the eight months prior to the termination hearing, appellant had almost no contact with the children. As the trial court concluded, appellant "has been given three years to work and complete this case plan and she still does not have a home, she is still not cooperating with [the Department] and she has in reality shown very little interest in the welfare of these children." These facts are clear and convincing evidence that appellant caused her children's deprivation.

The evidence also supports the juvenile court's finding that the children's deprivation is likely to continue. Appellant has shown very little interest either in her children's safety and welfare or in achieving the goals set for her in the case plans. Of primary importance was the requirement that appellant ensure the safety of her children. Yet, as the trial court observed in its order, appellant continued to have a relationship with the abuser of her children, and the threat to the children's safety "only subsided when the abuser was arrested and

placed in jail with time to serve." At the time of the termination hearing, appellant had not secured a home, had saved no money to do so, and had taken no serious steps to secure one. Nothing presented at the hearing provided any basis for concluding that appellant would change her course of behavior.

> Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue. The court was entitled to infer from the evidence that, despite the best efforts of [the Department] and many other social workers and charities, the same pattern of deprivation would continue (if) the children were reunited with their mother.

*In the Interest of R. W.*[4]

There was also clear and convincing evidence to support the trial court's finding that the children were likely to be seriously harmed by continuing deprivation.

> The same circumstances that authorized the juvenile court's determination that these children were deprived due to lack of proper parental control or to parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children.

*In the Interest of K. S. W.*, supra at 149 (3). We note that both N. J. and N. L. suffered physical injuries while in their mother's care. In addition, there was testimony that N. L. showed "signs of needing specific counseling and possibly even medication management," and N. J. showed "signs of needing speech therapy" and other treatment. Indeed, a Department employee testified that it intended to seek separate adoptive families for the two boys because N. J. was angry and aggressive and was directing this aggression toward his brother N. L. Appellant's failure to care for and protect her children is the cause of the children's need for therapy and specialized care, and there is no reason to believe that continuing deprivation will not cause greater physical, mental, emotional, and moral harm to the children.

Finally, though appellant does not challenge this finding, there was clear and convincing evidence that termination of appellant's

---

[4] *In the Interest of R. W.*, 248 Ga. App. 522, 524-525 (1) (546 SE2d 882) (2001).

parental rights is in the best interests of the children. "The same factors that show parental misconduct or inability can support a juvenile court's finding that termination of parental rights is in the [children's] best interest[s]." *In the Interest of V. M. T.*, supra at 736-737 (3). In light of appellant's failure to protect her children and avoid exposing them to physical and psychological harm, to provide them with a stable home and financial support, and to work with the Department toward completion of a reunification plan, it is clear that the juvenile court did not err in finding that N. J.'s and N. L.'s best interests would be served by terminating appellant's parental rights.

*Judgment affirmed. Ellington and Phipps, JJ., concur.*

DECIDED APRIL 10, 2003.

*Lindsey & Jacobs, Tamara Jacobs,* for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, W. Ashley Hawkins,* for appellee.