612 S.E.2d 581 (2005)
272 Ga. App. 429
IN THE INTEREST OF A.K., a child.
No. A05A0670.
Court of Appeals of Georgia.
March 23, 2005.
*583 Victoria Rowan, Douglasville, for appellant.
Thurbert Baker, Attorney General, Shalen Nelson, Senior Assistant Attorney General, Andrea Moldovan, Douglasville, for appellee.
JOHNSON, Presiding Judge.
This is an appeal from an order of the juvenile court terminating the mother's parental rights to A.K., a seven-year-old child. The mother contends there was not clear and convincing evidence of her inability to properly care for A.K. or clear and convincing evidence that the child's continued deprivation was likely to cause her serious physical, mental, emotional or moral harm. The mother also alleges that the trial court erred in failing to require the Douglas County Department of Family and Children Services (DFCS) to attempt to place the child with a suitable family member. We find no reversible error and affirm the juvenile court's order terminating the mother's parental rights. However, because the record contains insufficient evidence regarding DFCS's efforts to locate a suitable relative placement for A.K., we remand the case to the juvenile court for further determination regarding placement.
The evidence presented at the parental rights termination hearing revealed the following: Douglas County DFCS removed A.K. from her mother's care on February 12, 2002, following a neglect referral. The investigation revealed that six adults and the minor child were living in a three-bedroom residence, the residence was dirty, there was a lack of food, the minor child was developmentally delayed and her special needs were not being met, the minor child had multiple physical problems such as head lice, decayed teeth and swollen hands and feet, the minor child was not being properly supervised, and the minor child's mother had mental health problems.[1] DFCS filed a deprivation petition, which was delayed so the mother could undergo a psychological evaluation.
On August 30, 2002, the juvenile court held a hearing on DFCS's deprivation petition. The mother's evaluating psychologist testified that the mother had borderline intellectual functioning, elevated scores on the child abuse potential inventory test to the extent that she is at high risk of physical abuse of the child, a cognitive disorder and various other disorders. The psychologist doubted that the mother could parent A.K., even with extensive psychological intervention. The court adjudicated A.K. deprived and awarded temporary custody to DFCS. The order also incorporated a case plan which required the mother to (1) gain transportation and maintain employment or consistent income, (2) improve her parenting skills that are specific to A.K.'s needs, (3) obtain and maintain housing that meets A.K.'s needs, (4) become aware of A.K.'s needs and exhibit knowledge of the needs, (5) submit to a psychological evaluation and follow any recommendations for follow-up care, (6) maintain her emotional bond with A.K., (7) support A.K. financially, and (8) have A.K.'s medical and developmental needs met.
During the next 17 months, the juvenile court held judicial reviews and found that the mother had failed to comply with her case plan requirements. The overall permanency plan was changed from reunification to termination of parental rights. On February 6, 2004, DFCS filed a petition to terminate the mother's parental rights.
At the termination hearing, the mother testified that she had lived in nine residences since A.K. was removed from her custody, and she attributed her numerous moves to the fact that she could not get along with anyone. While the mother claimed she and her husband had lived in their current apartment for seven months and had a roommate *584 who intended to leave that week, she acknowledged that her apartment was not yet ready for A.K. because she was in the process of moving her belongings from her mother's house and her possessions were stacked in the apartment.
The mother admitted that she did not pay child support for A.K. She testified that no one asked her to pay child support, although the foster care supervisor testified that the department referred the mother to the Office of Child Support Enforcement when A.K. came into care. The mother testified that she had not worked since 2000, but had received SSI benefits because of her bipolar disorder and chronic lumbar disk problems. The mother acknowledged that her father handled her money.
The mother conceded that she failed to comply with her case plan goal requiring her to obtain counseling. She attended counseling only three times after A.K. was removed from her custody and last saw a counselor in February 2004. She explained that she stopped going to counseling because she did not think she needed it. She also claimed she could not pay the fees; however, she never discussed her purported inability to pay with DFCS. On cross-examination, the mother admitted that her case plans allowed her to attend counseling at the county health department or provider of her choice, and she reiterated that she did not need counseling.
The mother also testified that she had not seen a mental health physician since February 2004 because she had transportation problems.[2] When her bipolar medication prescription expired, she did not obtain a refill or make an appointment to obtain one. She told the court that she had not needed the medication and thought she would wait until she lost control before she took it again. She admitted that when she did not take her medication, she lost her temper more easily and was not certain what she might do. The mother testified that she took medication three times a day to treat muscle spasms, she took morphine twice a day and another drug once a day for pain associated with her back problems, and she was supposed to take another medication, but took herself off that one.
According to the mother, she had missed about half of her scheduled visits with A.K. since February 2004, which she acknowledged was not a good visitation record. She blamed missed visits on taking care of her sick mother, her own illnesses, and a lack of transportation, though she lived within walking distance of the visitation location. The foster care supervisor testified that she observed a few of the scheduled visits and noted very little interaction between the mother and A.K.; the mother even slept in a chair during one visit.
With regard to the case plan requirement that she become aware and exhibit knowledge of A.K.'s needs, the mother stated merely that A.K. was slow and the mother would try and speed her up a little. The mother revealed that she also had a nine-year-old son and an eight-year-old son who had lived with her parents most of their lives because she was unable to take care of them when they were born.
The psychologist who evaluated the mother testified that her overall IQ score was 70, which is in the borderline range, but that she was not functioning well for a person normally in that range. He also gave her the child abuse potential inventory. The cut-off scores for that test are 166-215, and the mother's score was 270. Therefore, he concluded, she was at risk of engaging in acts of physical child abuse. The psychologist further testified that he evaluated A.K. and found that she was a special needs child with developmental disorders and seizures. Given the mother's problems, he opined it would be difficult for her to provide the care that a special needs child would require. According to the psychologist, in light of the severity of the mother's problems, "it would be real optimistic to think that she could ever  ever parent."
A.K.'s caseworker testified that the mother failed to comply with her reunification case plans. The caseworker further noted that *585 the mother had tested positive for prescription drugs for which she did not have a prescription. According to the caseworker, A. K.'s progress had been "tremendous" since her placement in foster care. Though A.K. still had developmental delays, she received weekly counseling and was in a special needs program at her elementary school.
A.K.'s therapist testified that when she started treating A.K., the child was self-abusive, verbally abusive of others, had temper tantrums, was not toilet trained, and did not understand rules. Though the behavior problems had improved, they resurfaced when A.K. faced uncertainty, such as moving to a new home. A.K. also experienced developmental delays and cognitive problems. According to the therapist, A.K. required a stable home environment that was predictable, especially since she showed signs of attention deficit disorder and hyperactivity. The therapist recalled that she observed the mother at one session and that her relationship with A.K. was a peer relationship, not a parent/child relationship. A.K. was happy in her foster home and called her foster mother "mom."
At the conclusion of the hearing, A.K.'s guardian ad litem recommended termination of parental rights. The juvenile court subsequently entered an order terminating the mother's parental rights to A.K.
In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated.[3] In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[4]
1. In a number of enumerations, the mother challenges the sufficiency of the evidence upon which the juvenile court terminated her parental rights. We find no merit to these arguments.
A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[5] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[6] The mother does not raise any argument regarding the juvenile court's finding that termination of her parental rights is in the best interest of A.K. She merely argues that the evidence was insufficient to find parental misconduct or inability.
(a.) The mother contends that no evidence was presented regarding her inability to care for A.K. properly. According to the mother, there was no testimony regarding the effect or duration of her alleged mental health disability. We find no error.
The first factor in the determination of parental misconduct or inability is consideration of whether the child is deprived. In this case, A.K. was adjudicated deprived by unappealed juvenile court orders, and the mother is bound by those findings.[7] However, even without an express finding of deprivation by the juvenile court, there is clear and convincing evidence in the record that A.K. was deprived and still would be deprived if she were living with the mother.
Under Georgia law, a deprived child is one who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for *586 the child's physical, mental, or emotional health or morals."[8] One factor that juvenile courts must consider in determining whether a child lacks proper parental care and control is whether the parent possesses a medically verifiable health deficiency of such nature or duration as to render the parent unable to provide adequately for the child's needs.[9]
Here, an expert diagnosed the mother with borderline intellectual functioning, elevated scores on the child abuse potential inventory test to the extent that she is at high risk of engaging in acts of physical child abuse, a cognitive disorder and various other disorders. The expert further testified that he evaluated A.K. and found that she was a special needs child with developmental disorders and seizures. The expert opined that given the severity of the mother's problems, "it would be real optimistic to think that she could everever parent."
The expert opined that the mother needed long-term intensive psychological treatment, and he testified that the mother's problems would not resolve without such treatment. Nevertheless, the mother admittedly failed to obtain counseling and stopped taking prescribed medications because she did not feel she needed them. Although the mother contends the expert's testimony was speculative since his testing occurred two years prior to the termination hearing, the mother stipulated to the expert's qualifications as an expert in psychology. The juvenile court properly allowed the expert to testify about the mother's mental health status and its effects on her parenting abilities.[10]
In addition to the mother's extensive psychological problems, evidence further shows that when A.K. was removed from her home, the residence was dirty, there was a lack of food, the minor child was developmentally delayed and her special needs were not being met, the minor child had multiple physical problems such as head lice, decayed teeth and swollen hands and feet, and the minor child was not being properly supervised. Clearly, A.K. was deprived and a lack of proper parental care or control was the cause of her deprivation.
(b.) The mother asserts that the juvenile court failed to consider whether she complied with any of the three provisions of OCGA § 15-11-94(b)(4)(C), relevant when a child is not in custody of the parent at the time of the termination. This enumeration of error lacks merit.
OCGA § 15-11-94(b)(4)(C) provides as follows:
In addition to the considerations in subparagraph (B) of this paragraph, where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights:
(i) To develop and maintain a parental bond with the child in a meaningful, supportive manner;
(ii) To provide for the care and support of the child as required by law or judicial decree; and
(iii) To comply with a court ordered plan designed to reunite the child with the parent or parents.
Here, the record establishes that the mother failed to support A.K. and failed to comply with her case plan goals.[11] In addition, a caseworker testified that the mother did not attend many visits with A.K., and those she did attend showed that the bond between the two could not be called a parental bond.
While the mother argues that the caseworker's testimony should be disregarded because it was based on others' reports *587 and thus constituted inadmissible hearsay, she only raised this objection twice: once to a response about the number of visits she had missed and once to a response about A.K.'s development. No hearsay objection was raised with respect to testimony regarding the mother's noncompliance with her case plan goals, and she cannot raise this objection for the first time on appeal.[12] Moreover, the caseworker's testimony about the mother's missed visits was allowable under OCGA § 15-11-56(a), which provides that all information that may be helpful to the juvenile court in determining the issues may be received and relied upon to the extent of its probative value, even if the information may not otherwise be competent evidence.[13]
(c.) Having found that A.K. is deprived and that such deprivation is caused by the mother, the third factor to be considered is whether the deprivation of A.K. is likely to continue. The mother contends the juvenile court based its determination of deprivation and parental unfitness on past unfitness alone, failing to address the issue of present unfitness. We again disagree.
We first note that in addition to evidence of present parental misconduct or inability, evidence of past conduct may properly be considered in determining whether the deprivation would be likely to continue if A.K. was returned to her mother.[14] Repeated failure to comply with case plan goals may show that the cause of the deprivation is likely to continue.[15] Here, in considering whether the past deprivation was likely to continue, the juvenile court looked at the present progress, or lack thereof, of the mother's compliance with her case plan goals. It was obvious that, despite the best efforts of DFCS to assist the mother in reuniting with A.K., the mother had made little progress and had failed to comply with her case plan goals. The juvenile court was authorized to infer from the evidence that such noncompliance was likely to continue.[16] Although the mother insisted she would be able to care for A.K. soon, the court was entitled to place more weight on "negative past facts" than "positive promises" or projections as to the future, and to find that, in view of the mother's past conduct, the deprivation was likely to continue.[17]
The court was also permitted to consider the mother's unwillingness to consistently treat her medical condition in determining that the deprivation was likely to continue.[18] Expert testimony showed that the mother had mental problems for which she needed intensive counseling and medication. However, the mother admitted at the hearing that she had quit taking her medication and that she had not been going to counseling. The mother's failure to comply with the requirements of court-mandated mental health counseling is a factor to be considered in determining the likelihood of whether the deprivation is likely to continue or will not likely be remedied.[19]
In addition, the fact that the mother had two other children who were not in her care and who were not supported by her indicates that she similarly would be unable to care for A.K.[20] This is especially true given the expert's unequivocal testimony: the mother is incapable of caring for her special needs child *588 and is at high risk of physically abusing the child. Based on this evidence, the juvenile court was authorized to find that the mother's parental unfitness is continuing and is unlikely to be remedied.
(d.) The final factor to be considered is whether the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to A.K. The mother asserts that the juvenile court erred by failing to make any specific findings to support its conclusion that the continued deprivation will cause or is likely to cause A.K. serious physical, mental, emotional or moral harm. This Court has rejected similar arguments, finding that although the juvenile court did not identify specific facts supporting its conclusions that continued deprivation would likely cause serious harm, the respective termination orders contained facts supporting the conclusions.[21] This reasoning is equally applicable here.
In the present case, the juvenile court found that "the continued deprivation of the minor child will cause serious physical, mental, emotional or moral harm to the minor child as evidenced by the severe delays she exhibited at the time she entered foster care and the improvements she has made in a structured one on one learning environment provided while in foster care." The juvenile court's conclusion that A.K.'s continued deprivation is likely to cause her serious harm is supported by the record and its termination order.[22]
The same circumstances that supported the juvenile court's conclusion that A.K. is deprived due to a lack of proper parental care or control and that such deprivation is likely to continue also provide clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause A.K. serious physical, mental, emotional, or moral harm.[23] Here, the facts clearly demonstrate that the mother failed to complete DFCS's reunification plan and that her parenting skills have been severely impaired by recurring psychological problems. The mother failed to obtain housing or employment, failed to improve parenting skills specific to her child's special needs, failed to continue psychological counseling, failed to support A.K., and failed to maintain any parental relationship with A.K.
In this case, the evidence strongly supports a finding that the mother is physically, emotionally and financially unable to manage her own life, even without the added burden of a child with special needs. There is no indication that the mother will be prepared in the near future to care for A.K. and to provide for her medical, emotional and educational needs. And, the evidence shows that it would be in A.K.'s best interest to be in a permanent, structured environment.
In addition, the juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to A.K.[24] It is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.[25] A caseworker's testimony about the need for permanency may be considered by the juvenile court. Here, the evidence showed that A.K. was removed from the mother's home on two separate occasions and has not lived with her mother in almost three years. A.K. has made tremendous developmental gains since being in foster care. Moreover, observations by DFCS workers of the interaction between A.K. and her mother indicate that the child has not bonded with the mother. In fact, A.K. calls her foster mother "mom." Such evidence supports a *589 finding that A.K. would suffer confusion, developmental stagnation, and other serious harm if returned to the mother's custody. The juvenile court properly found that A.K.'s continued deprivation would likely cause her serious physical, mental, emotional or moral harm.
2. The mother contends that the juvenile court erred in failing to require DFCS to make a thorough search for a suitable relative placement for A.K. In its brief, DFCS concedes that the record contains insufficient evidence regarding its reasonable efforts to locate an appropriate relative placement. Therefore, while we affirm the order terminating the mother's parental rights, we remand this case to the juvenile court for further determination regarding placement.
Judgment affirmed and case remanded with direction.
RUFFIN, C.J., and BARNES, J., concur.
NOTES
[1] This was the second time that A.K. had been removed from the mother's home. In 1999, Cobb County DFCS obtained custody of A.K. because of the mother's instability.
[2] The mother conceded that she did not maintain stable transportation; her car broke down several months before the hearing and it remained unrepaired.
[3] In the Interest of N.L., 260 Ga.App. 830, 581 S.E.2d 643 (2003).
[4] Id.
[5] OCGA § 15-11-94(b)(4)(A)(i)-(iv).
[6] OCGA § 15-11-94(a).
[7] See In the Interest of E.C., 225 Ga.App. 12, 14-15, 482 S.E.2d 522 (1997).
[8] OCGA § 15-11-2(8)(A).
[9] OCGA § 15-11-94(b)(4)(B)(i); In the Interest of D.D.B., 263 Ga.App. 325, 327(1), 587 S.E.2d 822 (2003).
[10] See OCGA § 24-9-67 (providing that opinions of experts on any question of science, skill, trade, or like question shall always be admissible).
[11] See In the Interest of J.J., 259 Ga.App. 159, 162, 575 S.E.2d 921 (2003).
[12] See In the Interest of H.D.M., 241 Ga.App. 805, 808(2), 527 S.E.2d 633 (2000).
[13] See In the Interest of O.J., 257 Ga.App. 1, 4(2), 570 S.E.2d 79 (2002) (admissibility of testimony from a caseworker who relied on notes generated prior to her involvement was not reversible error).
[14] In the Interest of D.N.B., 258 Ga.App. 481, 485(2), 574 S.E.2d 574 (2002).
[15] In the Interest of M.C.L., 251 Ga.App. 132, 135(1)(a), 553 S.E.2d 647 (2001).
[16] See In the Interest of N.L., supra at 835, 581 S.E.2d 643; In the Interest of M.C.L., supra.
[17] In the Interest of R.A.R., 259 Ga.App. 680, 686(2), 577 S.E.2d 872 (2003); In the Interest of V.I.D., 259 Ga.App. 40, 43, 576 S.E.2d 297 (2002).
[18] See In the Interest of D.D.B., supra at 328(1)(c), 587 S.E.2d 822.
[19] See In the Interest of G.L.H., 209 Ga.App. 146, 150(2), 433 S.E.2d 357 (1993).
[20] See In the Interest of S.L.B., 265 Ga.App. 684, 688(1), 595 S.E.2d 370 (2004).
[21] In the Interest of B.I.F., 264 Ga.App. 777, 780(1), 592 S.E.2d 441 (2003); In the Interest of J.A.R.S., 262 Ga.App. 237, 240(2), 585 S.E.2d 184 (2003).
[22] See In the Interest of M.L., 259 Ga.App. 534, 536-537(1)(d), 578 S.E.2d 190 (2003).
[23] See In the Interest of M.J.T., 255 Ga.App. 553, 556, 565 S.E.2d 877 (2002); In the Interest of K.S.W., 233 Ga.App. 144, 149(3), 503 S.E.2d 376 (1998).
[24] See In the Interest of R.A.R., supra at 686-687(3), 577 S.E.2d 872.
[25] Id. In the Interest of M.C.L., supra at 136, 553 S.E.2d 647.