A02A0045. IN THE INTEREST OF R. S., a child.
(566 SE2d 461)

POPE, Presiding Judge.

R. S. J., the biological father of R. S., appeals the termination of his parental rights and contends there was insufficient evidence to support the decision. Because we find that there was no evidence presented to support one of the required elements necessary to support termination, we reverse.

In reviewing the trial court's decision, we must determine

whether, after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could

have found by clear and convincing evidence that the natural parent's right to custody should be terminated. On appeal, this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.

(Citations and punctuation omitted.) *In the Interest of C. L. R.*, 232 Ga. App. 134 (1) (501 SE2d 296) (1998).

The child was born on November 28, 1996, one month after R. S. J. and the child's mother, G. S., were divorced. One month later, a neighbor told R. S. J. that his ex-wife had given birth and that he could be the father. R. S. J. acknowledged that possibility and even wondered if he could get some blood from the child's finger in order to check. The neighbor also encouraged him to get a lawyer and "fight for the baby." R. S. J. did not take any such action at the time. Meanwhile, at sometime prior to May 1997, the child's mother entered into a relationship with another man, M. S.

In May 1997, the Chatham County Department of Family & Children Services ("DFCS") became involved with the family because of allegations of neglect and possible abuse. At that time, G. S. represented that she and M. S. were married and that M. S. was the father of the child. A case plan was developed for keeping the child in the home. However, G. S. and M. S. failed to comply with the plan, and in February 1998, they moved to Tennessee with the child. The case was transferred to proper authorities in that state.

In May of that year, G. S. returned to Georgia but did not have housing. She checked herself into an in-patient facility, apparently for treatment for schizophrenia and poly-substance abuse. At that point, DFCS took custody of the child and filed a petition alleging deprivation. On May 18, 1998, the juvenile court held a hearing at which evidence was presented that showed the child was deprived. The court entered an order finding deprivation, and that order has not been appealed. The court found that the child was deprived based on the mother's admission that she had been diagnosed with schizophrenia and poly-substance abuse. She had failed to comply with treatment plans, to regularly take her medication, or to regularly attend aftercare services. Furthermore, the child lacked a stable home environment, and even before they moved to Tennessee, the couple had failed to complete the case plan.

The court transferred temporary custody to DFCS and incorporated by reference a case plan for reunification with G. S., but she failed to comply with that plan and extensions thereof.

In June 1999, G. S. told DFCS for the first time that R. S. J. could be the father of the child. In July or August, R. S. J. contacted DFCS

and inquired about the child. He was told at that time that he would need to submit to a paternity test.

On October 12, 1999, DFCS petitioned for termination, and, in addition to G. S. and M. S., it served R. S. J. with a copy of the petition. He received it later that month. At a hearing on the petition on December 16, R. S. J. obtained a continuance on the grounds that he had recently submitted to a paternity test, which established paternity, and that, therefore, he was seeking time to work with DFCS toward the possibility of having the child placed in his or a family member's care.

The termination hearing was reconvened on May 2, 2000. A significant part of the evidence presented reflected favorably on R. S. J. After the continuance was granted, DFCS developed a case plan with a goal of placing the child with him. The goals included stable housing, stable employment, abstinence from drug and alcohol use, parenting classes, and a psychological examination. From December 1999 through May 2000, R. S. J. had maintained stable employment and a home. The home was clean and the utilities paid for. He had visited the child and shown adequate parenting skills when he was with the child. He had been more than willing to comply with other aspects of the plan and had stayed in contact with DFCS on a regular basis. Further, R. S. J. was prevented by DFCS from completing some elements of the plan due to scheduling difficulties. This included obtaining the psychological exam and parenting classes. He did fail to present to DFCS proof that he had attended substance abuse training, but the evidence showed that he was receiving counseling. He also sought, as was required by the plan, to legitimate the child. Finally, the DFCS caseworker testified that in her career of working with people on reunification plans, she had never seen anyone as dedicated as R. S. J. had been.

Significant evidence was also presented that reflected poorly on R. S. J. The Ware County Department of Family & Children Services conducted a required evaluation of R. S. J.'s home, which was located in that county. That review included a background check that revealed (1) a felony conviction for terroristic threats, interference with government property, and simple battery, which was entered on February 29, 2000; (2) a conviction dated January 13, 1997, for driving under the influence, driving without a license, and driving without proof of insurance; (3) a conviction dated January 15, 1997, for public indecency, public drunkenness, and disorderly conduct; (4) a conviction for the felonies of terroristic threats and obstruction of justice, and the misdemeanors of driving under the influence, obstruction, and driving without proof of insurance arising out of incidents occurring on January 13, 1996, during which R. S. J. threatened to kill a law enforcement officer; (5) a felony conviction for possession of

cocaine for events occurring on October 2, 1990; (6) a conviction for the misdemeanors of criminal trespass and reckless conduct arising out of shooting through a glass door thereby endangering another on November 2, 1989; (7) a conviction dated February 23, 1990, for driving under the influence, driving with a suspended license, running a stop sign, driving without proof of insurance, simple assault, and obstruction; and (8) evidence of 30 arrests including some involving violent conduct and terroristic acts.

On the most recent conviction, R. S. J. was given three years probation and banished from the Eastern Judicial Circuit. He was also ordered to participate in evaluation and treatment for alcohol and drug abuse. That conviction occurred after R. S. J. obtained the paternity test and sought a continuance in this case, and it arose out of events occurring in late 1999, after he admits he became aware of the possibility of his paternity. Several of the other convictions occurred after the birth of the child, and R. S. J. has been incarcerated on a total of five different occasions. As a result of the criminal background, Ware County denied placement of the child with R. S. J. in his home.

R. S. J.'s substance abuse counselor also testified. At the time of the hearing, R. S. J. had been enrolled in a 12-step substance abuse program. He had regularly attended, appeared motivated, and was about at the middle of the program for dealing with his addiction. Although the counselor believed he was a good candidate for recovery, he agreed that R. S. J.'s recent behavior that resulted in a conviction for terroristic threats, interference with government property, and simple battery was inconsistent with his optimistic opinion of R. S. J.'s chance of recovery.

On June 6, 2000, based on the evidence described above, the court terminated the rights of G. S.[1] and R. S. J. to the child. The court initially found that R. S. J. was the legal and natural father of the child because the child was born within the gestation period after the parents' divorce and because of the paternity test results. The court concluded that the child was deprived and that the cause of the deprivation was the failure of the parents to provide care for the child. The court also held that this failure was likely to cause harm to the child by virtue of his languishing in foster care.

With regard to R. S. J., the court found that he had "substantially complied" with the requirements of the case plan, but found that he had an ongoing substance abuse problem. And although R. S. J. had only recently conclusively established paternity, he had known about the possibility for years before coming forward to assert

---

[1] The mother has not appealed the termination of her parental rights.

his right to the child, and he took formal steps only after the termination petition was filed.

OCGA § 15-11-94 establishes a two-step process for considering parental rights cases. The court is first required to determine whether there is clear and convincing evidence of parental misconduct or inability. If there is, the court considers whether termination of parental rights is in the best interest of the child. Id. "Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship." *Carvalho v. Lewis*, 247 Ga. 94, 95 (274 SE2d 471) (1981).

> Parental misconduct or inability is established upon finding that the child is deprived; that the lack of proper parental care or control is the cause of the deprivation; that the child's deprivation is likely to continue or will not be remedied; and that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94 (b) (4) (A); [cit.]

*In the Interest of C. N. S.*, 248 Ga. App. 84, 85 (545 SE2d 633) (2001). Evidence was presented sufficient to show the first three of these elements. When the juvenile court awarded temporary custody to DFCS it found that the child was deprived and entered an order to that effect, which was not appealed. See *In the Interest of C. J. V.*, 236 Ga. App. 770, 774 (513 SE2d 513) (1999). Furthermore, R. S. J. has not disputed that the child is deprived. The trial court found that the child is languishing in foster care, and that is supported by the record. Second, lack of proper parental care or control may be shown by the "[c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship." OCGA § 15-11-94 (b) (4) (B) (iii). And repeated incarcerations for criminal offenses can constitute evidence of aggravating circumstances sufficient to compel termination of parental rights. *In the Interest of C. N. S.*, 248 Ga. App. at 85-86; *In the Interest of B. C.*, 235 Ga. App. 152, 154 (a) (508 SE2d 774) (1998). R. S. J.'s criminal history and history of alcohol abuse during the life of the child plus his failure to take any steps to assert his rights as a parent until formal termination proceedings were brought were, at least in part, a cause of the child's deprivation. Finally, evidence of past conduct may be considered in determining whether the deprivation is likely to continue if the children are returned to their parent. *In the Interest of C. W. D.*, 232 Ga. App. 200, 204 (1) (501 SE2d 232) (1998). Furthermore, R. S. J. was convicted and sentenced for committing felonies after the time that he began to assert his parental rights to the child. Therefore, as of the time of the hearing, any

rational trier of fact could have found by clear and convincing evidence that the cause of deprivation would continue. See *In the Interest of C. N. S.*, 248 Ga. App. at 85-86.

However, in order to terminate parental rights, the court must also find by clear and convincing evidence that "[t]he continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." OCGA § 15-11-94 (b) (4) (A) (iv). We find that although the court made that conclusion, it did not support the conclusion with explicit findings, and, therefore, we must reverse.

*In the Interest of K. J.*, 226 Ga. App. 303, 307 (2) (b) (486 SE2d 899) (1997), is on point. There the father's repeated incarcerations supported findings that the father's lack of parental care or control caused the child to be deprived and that this deprivation was likely to continue. Id. at 306-307 (2) (a). In that case, the court found that continued deprivation would likely cause serious physical, mental, emotional, or moral harm to the child, but the order did not contain explicit findings supporting that conclusion. Id. at 307 (2) (b). Such findings are required. Id. (and cases cited therein). Accordingly, we reversed the trial court's decision. Id. at 307-309 (2) (b).

In this case, the trial court found that the parents' failure to provide care for the child "is likely to cause harm to the child by virtue of [the child's] languishing in temporary foster care." But, the order does not contain explicit factual findings supporting that conclusion. And, the court's conclusion fails to consider that placing the child with R. S. J. would bring an end to the child's placement in foster care. Moreover, our own review of the record fails to yield any other evidence on this issue. No witness testified that the child was likely to suffer harm if R. S. J.'s parental rights were not terminated. Some of the only evidence on point was that R. S. J. showed adequate parenting skills during his conduct with the child. Similar to *K. J.* and *In the Interest of J. M.*, 251 Ga. App. 380 (554 SE2d 533) (2001), "the lack of evidence and findings on this matter precludes us from concluding that the evidence authorized the juvenile court to find by clear and convincing evidence that the [child was] likely to suffer serious physical, mental, moral, or emotional harm; thus, we are constrained to reverse." 251 Ga. App. at 384 (4).

*Judgment reversed. Ruffin, J., concurs. Barnes, J., concurs in the judgment only.*

DECIDED JUNE 13, 2002.

*Darden, Burns & Harris, Richard M. Darden, John D. Gatch*, for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Beckmann & Lewis, Leo G. Beckmann, Jr.*, for appellee.