A05A1789. IN THE INTEREST OF J. K. et al., children.
(629 SE2d 529)

BLACKBURN, Presiding Judge.

The juvenile court of Gwinnett County terminated the parental rights of the mother of J. K. and J. K. II, seven-year-old twin girls. The mother appeals, challenging the sufficiency of the evidence. For reasons that follow, we affirm.

On appeal, we review the evidence in a light most favorable to the lower court's judgment and determine only whether "any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated." (Punctuation omitted.) *In the Interest of J. R.*[1] We defer to the juvenile court's factfinding and thus neither weigh the evidence nor evaluate

---

[22] *In re Hall County Grand Jury Proceedings,* supra at 350.
[1] *In the Interest of J. R.,* 274 Ga. App. 653 (1) (618 SE2d 688) (2005).

witness credibility. See id. Nonetheless, we are mindful that "[b]ecause no judicial determination has more drastic significance than permanently severing a parent-child relationship, such severance must be exercised cautiously and scrutinized deliberately." *In the Interest of T. J. J.*[2]

Viewed in this manner, the record shows that although the mother was married at the time of the girls' birth, the girls' putative father, Bryan Leitch, is not her husband. The girls were first removed from the care of their mother and her husband in July 2000, when they were eight months old, because one of the girls had been injured by her thirteen-year-old brother while left in his care. At that time, the juvenile court found that the girls were deprived due to a lack of proper parental control. A case plan was subsequently put into effect, requiring the mother to complete anger management and parenting classes, to undergo a psychological evaluation and a drug evaluation, and to cooperate with the Department of Family and Children Services ("DFCS").

The girls were returned to the custody of their mother and her husband in November 2001. The mother was to complete a psychosexual examination by the Medlin Clinic and continue to work on her case plan. In February 2002, the juvenile court found that the mother had not completed treatment recommendations made by the Medlin Clinic and had allowed contact between the girls and her son, which was forbidden by the case plan. The girls were not removed from her care at that time.

During a visit by a DFCS caseworker in May 2002, the mother, who was alone at home with the girls, could not be roused to answer the door. The police were eventually called to break into the house. J. K. and J. K. II were again found to be deprived and placed in DFCS custody. As part of her case plan, the mother was ordered to continue treatment at the Medlin Clinic; to be evaluated by a neuropsychologist; to see a psychiatrist for medication for depression, paranoia and severe mood swings; to attend parenting classes and marital counseling; and to participate in her son's ongoing psychological treatment. In February 2003, the juvenile court granted temporary custody of the girls to Gerald and Renee Leitch, their paternal grandparents.

The mother has had supervised visitation with the girls since they were placed in the Leitches' custody. However, she has provided no financial support for the girls other than occasional gifts, despite receiving a $30,000 inheritance.

The mother did not comply with the juvenile court's May 2002 order to continue treatment at the Medlin Clinic and to follow up with

---

[2] *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

treatment recommendations resulting from her neuropsychological and psychiatric evaluations. She did not have regular employment or reliable transportation. She enrolled in Gwinnett Tech in December 2003, but had yet to take any classes as of April 2004. At the time of the hearing, the mother was not current on her mortgage payments. She has taken prescription Hydrocodone daily for the past eight years and cannot walk without it. Elizabeth McClure, director of the facility where the supervised visitation took place, testified that the mother kept her regular visits with the children, although she sometimes did not stay for the entire time scheduled due to transportation difficulties. McClure observed that the mother was unable to effectively discipline the children, and testified that unsupervised visitation would not be appropriate.

In its order of July 7, 2004, the juvenile court again found that the girls were deprived due to a lack of parental care and ability. Specifically, the court concluded that the mother had "willfully refused and woefully failed" to comply with court-ordered counseling, resulting in her diagnosed mental health problems remaining untreated; had depended on pain medication which rendered her unable to care for the children; had provided no meaningful financial support for the children and was barely able to support herself; and had failed to develop and maintain a bond with the girls during her visits with them. The juvenile court therefore terminated the mother's parental rights to J. K. and J. K. II. The mother filed a motion for a new trial, which was denied.

1. A basic review of the governing statute is in order. In a termination of parental rights case, OCGA § 15-11-94 (a) requires the trial court to consider whether there is clear and convincing evidence of parental misconduct or inability as provided in subsection (b) of that Code section. If such is shown, then the court considers whether termination of parental rights is in the best interest of the child.

Subsection (b) of the statute then sets forth four criteria that must be proven for the trial court to conclude that parental misconduct or inability is shown. Although the four criteria are separately listed, often they overlap, thus allowing evidence displaying one of the criteria to prove or at least partially prove one or more of the other criteria. The four criteria that the court must find in order to hold that parental misconduct or inability is shown are:

> (i) The child is a deprived child, as such term is defined in Code Section 15-11-2;
> (ii) The lack of proper parental care or control by the parent in question is the cause of the child's status as deprived;

(iii) Such cause of deprivation is likely to continue or will not likely be remedied; and

(iv) The continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

OCGA § 15-11-94 (b) (4) (A).

A careful review of these criteria demonstrates the overlapping nature of the evidence to show each. First, to show that a child is a deprived child, the State must present evidence that the child:

(A) Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals;

(B) Has been placed for care or adoption in violation of law;

(C) Has been abandoned by his or her parents or other legal custodian; or

(D) Is without a parent, guardian, or custodian.

OCGA § 15-11-2 (8). The vast majority of parental termination appellate cases focus on subsection (A), namely whether the child is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals.

OCGA § 15-11-94 (b) (4) (A) requires: (i) that the State must show that the child is a deprived child; (ii) the State to prove that cause of the child's derived state is the lack of parental control or care; (iii) a finding that if the child is returned to the conditions in place at the time of the filing of the deprivation petition, such deprivation is likely to continue, and not be remedied; and (iv) a finding that the continued deprivation will likely cause serious physical, mental, emotional, or moral harm to the child. The only logical inquiry as to section (iv) is whether the child *would be* harmed if returned to the parent's care and control, associated environment, and state of deprivation. In other words, although the child was found deprived on the hearing date, the question for termination is if the child were returned to the parent's care and associated environment, would the child be harmed thereby? Section (iv) inquiry is reached after the first three requirements have been met.

2. Here, the mother concedes that the first three factors are present; nonetheless, she contends that the juvenile court erred in

finding parental misconduct or inability because there was insufficient evidence of the fourth factor: that the continued deprivation was likely to cause the children serious harm. The mother argues that while the State proved deprivation, it did not show that the girls would be harmed by remaining in their grandparents' care and having supervised visitation with her. That is not the issue. The question is whether, if the children were returned to the mother's care, would they likely suffer serious harm as a result thereof? It has been stipulated that the children were deprived as a result of the mother's failure to care for them and that such condition was likely to continue if the children were returned to the mother. The only other question is would the children be harmed by returning to the conditions that resulted in the original removal of the children from the mother's control?

The juvenile court below made the following specific findings — the mother: did not financially support her children, even when funds were available to her; failed to develop a parental bond with the girls; was dependent on prescription medication to the extent that she was physically unable to care for her children; was unwilling to undergo mental health treatment which experts believed was vital to "stabilize the mother and enable her to parent the children" and which the court found essential to prevent serious harm to the girls; and repeatedly and continually failed to obey court orders or cooperate in her case plan. These express findings were sufficient to justify the juvenile court's conclusion that continued deprivation in this case would cause serious mental, emotional, and moral harm to the children, since the return of these children to their mother's care in her present and most likely continuing condition would likely result in serious harm to the children. See *In the Interest of P. L. S. D.*;[3] *In the Interest of L. G.*[4] Accordingly, we affirm the juvenile court's termination of the mother's parental rights to J. K. and J. K. II. See *In the Interest of A. S. H.*[5]

3. Finally, we note that the cases that others would disapprove each show that the evidence demonstrating the first three factors showed the serious harm mandated by the statute for termination. In *In the Interest of C. R. G.*,[6] the evidence concerning the first three factors showed that since her child had been taken into State custody, a mentally retarded mother had made no improvement in her woefully lacking parenting skills and unstable employment, which had

---

[3] *In the Interest of P. L. S. D.*, 275 Ga. App. 49, 52 (a) (4) (619 SE2d 755) (2005).

[4] *In the Interest of L. G.*, 273 Ga. App. 468, 475-476 (2) (d) (615 SE2d 551) (2005).

[5] *In the Interest of A. S. H.*, 239 Ga. App. 565, 570-571 (1) (521 SE2d 604) (1999).

[6] *In the Interest of C. R. G.*, 272 Ga. App. 161 (611 SE2d 784) (2005).

resulted in the original finding of deprivation when the asthmatic child was found dehydrated and lacking proper medication and when the mother refused to move out of her boyfriend's home, even though the boyfriend was a registered sex offender. With such obvious evidence of harm, our Court in *C. R. G.* logically concluded that "[t]he same evidence supporting a finding that the deprivation is likely to continue also supports a finding that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child." Id. at 164-165. We see no reason to disapprove this language.

In *In the Interest of M. E. M.*,[7] the special needs children were taken from the mother's care when she was found living in a local motel with a male who was a drug abuser and had abandoned the children to the care of a grandmother whose husband had been charged with the rape and sodomy of the mother's sister. Since that time, the mother had moved nine times, had no stable home or income, had rarely visited the children or provided any financial support for them, had made no attempt to maintain a relationship with them, and in fact had executed a document surrendering her parental rights in the children. Despite this undeniable evidence of harm to these children, who needed special care but had been outright abandoned by their mother, the special concurrence would disapprove of the case on the ground that it relies on evidence from the prior three factors in concluding that the children would likely be harmed if returned to the mother's care. The fact that a case acknowledges that evidence tends to prove more than one factor is no reason to disapprove that case. To the contrary, the case is an efficient if not shining example of how a case should be proven by the State.

In *In the Interest of T. G.*,[8] the children were removed from the parents' home because of the violent, volatile, unstable nature of the home environment where the parents fought so violently and so often in front of the children that the police had been involved at least ten times to resolve the violence. The mother had a history of mental illness, but refused to take her medication. After the children were placed in foster care, the mother became so angry that she had the father jailed. At a panel hearing, both parents demonstrated volatile behaviors toward each other without regard to the impact their behavior had on their children, with the mother so out of control that police were called to the panel hearing to settle her down. This behavior continued over the years of the children's foster care, with the parents reconciling and then violently fighting, and with the mother lying to the children (telling them they could go home with her

---

[7] *In the Interest of M. E. M.*, 272 Ga. App. 451 (612 SE2d 612) (2005).

[8] *In the Interest of T. G.*, 269 Ga. App. 278 (603 SE2d 764) (2004).

if they were good) and lying to DFCS (telling them the father no longer lived with her when in fact he did). These violent incidents between the parents continued right up until the termination hearing, with the evidence showing that the children's safety would be in jeopardy if returned to the parents. Due to this lengthy history of lying, severe conflict, domestic violence, separation, and reconciliation, the juvenile court concluded that the deprivation would continue. We upheld this finding and noted that this evidence also met the fourth criterion by demonstrating that the children would likely be harmed if returned to the parents. We explained: "Clearly, placing these children back into a volatile environment where they are subject to sudden and violent altercations between their parents will cause mental, emotional, and moral, if not physical, harm to them." Id. at 284. We see no reason why our relying on the same relevant and persuasive evidence showing the third factor to also prove the fourth factor should be disapproved, as suggested by the special concurrence. Indeed, facts do not come neatly bundled, and so long as each of the requirements of the statute is met, the facts do not need to follow the sequence of enumeration found desirable by the legislature.

Each of the other cases that the special concurrence suggests should be disapproved also contains clear evidence of harm to the children and therefore should not be disapproved just because the decisions cited evidence from the prior three factors in determining that harm to the children. See *In the Interest of R. S. H.*[9] (mother's severe psychological disorders resulted in deplorable living conditions for the children — roaches and feces, with the children eventually living in a car in which the mother was having an ongoing sexual relationship with her own biological father; mother failed to obtain mental health treatment once the children were removed, had disturbing visits with the children, and did not obtain stable housing or employment); *In the Interest of S. L. B.*[10] (mother's continued and repeated history of severe drug abuse, criminal behavior, and incarceration, even after losing her child, coupled with her lack of effort to develop a parental relationship with the child or her other children, to obtain employment, to receive treatment, or to provide financial support for any of her children showed harm to the child); *In the Interest of J. J.*[11] (drug-addicted mother abused children, had them living in deplorable conditions, and allowed them to be sexually molested at home by father; after children taken away, mother was

---

[9] *In the Interest of R. S. H.*, 269 Ga. App. 292, 297-298 (603 SE2d 675) (2004).
[10] *In the Interest of S. L. B.*, 265 Ga. App. 684, 688 (1) (595 SE2d 370) (2004).
[11] *In the Interest of J. J.*, 259 Ga. App. 159 (575 SE2d 921) (2003).

incarcerated for series of crimes and did not obtain drug treatment or maintain regular contact with children); *In the Interest of D. S.*[12] (mentally ill mother allowed children to live in deplorable conditions and even after children were taken refused to receive mental health treatment or learn parenting skills or support the children); *In the Interest of K. L.*[13] (parents allowed children to live in deplorable conditions, which conditions continued without improvement even after the children were taken away); *In the Interest of K. S. W.*[14] (father incarcerated for criminal neglect of children and made no subsequent efforts to support children financially or communicate with them).

Thus, contrary to the characterization of these cases, each remained true to the requirement that the State prove the continued deprivation would likely cause serious harm to the child's health or morals. Evidence of harm was present and found in each case, as it was also properly found here.

*Judgment affirmed. Andrews, P. J., Smith, P. J., Barnes, Miller, Phipps, Mikell and Bernes, JJ., concur. Ruffin, C. J., Johnson, P. J., Ellington and Adams, JJ., concur specially.*

RUFFIN, Chief Judge, concurring specially.

I concur in the majority opinion affirming the termination of parental rights; however, I write separately to address a conflict in the case law on one aspect of the standard for establishing parental misconduct or inability.

Before a court terminates a parent's rights to his or her children, it must first find clear and convincing evidence of parental misconduct or inability; only after such a finding is made may a court consider whether termination of parental rights is in the best interest of the child.[15] In order to establish parental misconduct or inability, the legislature has determined that the following four factors must be proved:

> (1) the child must be deprived; (2) the lack of proper parental care or control by the parent in question must cause the deprivation; (3) the cause of the deprivation must be likely to continue; and (4) continued deprivation must be likely to cause the child serious physical, mental, emotional, or moral harm.[16]

---

[12] *In the Interest of D. S.*, 247 Ga. App. 569, 571 (545 SE2d 1) (2001).

[13] *In the Interest of K. L.*, 234 Ga. App. 719 (507 SE2d 542) (1998).

[14] *In the Interest of K. S. W.*, 233 Ga. App. 144, 147-148 (1) (503 SE2d 376) (1998).

[15] See OCGA § 15-11-94 (a).

[16] (Punctuation omitted.) *In the Interest of L. G.*, 273 Ga. App. 468, 470-471 (2) (615 SE2d

The focus in this case is the fourth factor, which requires evidence that the continued deprivation is likely to cause the children serious harm. The rules of statutory construction require that we "construe a statute according to its terms, . . . give words their plain and ordinary meaning, and . . . avoid a construction that makes some language mere surplusage."[17] Nonetheless, language in some of this Court's previous cases has been read and cited by the State to suggest that the evidence supporting a finding of continuing deprivation is enough — in and of itself — to prove that the child will also be harmed by the deprivation.[18] In *In the Interest of K. S. W.*, this Court wrote:

> The same circumstances that authorized the juvenile court's determination that these children were deprived due to lack of proper parental control or to parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children.[19]

This language has been reiterated in numerous other cases, often with no specific analysis of whether the fourth factor has in fact been proven.[20]

In another line of cases, however, this Court has confirmed that a finding of continuing deprivation is not enough to demonstrate that the deprivation is harmful to the child.[21] Rather, these cases require affirmative evidence that the child will be seriously harmed by an ongoing parental relationship.[22] Other panels of this Court have

---

551) (2005); see also OCGA § 15-11-94 (b) (4) (A) (i)-(iv) (setting forth basis for court's determination of parental misconduct or inability).

[17] *Slakman v. Continental Cas. Co.*, 277 Ga. 189, 191 (587 SE2d 24) (2003).

[18] See *In the Interest of K. S. W.*, 233 Ga. App. 144, 149 (3) (503 SE2d 376) (1998).

[19] Id.

[20] See *In the Interest of C. R. G.*, 272 Ga. App. 161, 164-165 (611 SE2d 784) (2005); *In the Interest of M. E. M.*, 272 Ga. App. 451, 455 (612 SE2d 612) (2005); *In the Interest of T. G.*, 269 Ga. App. 278, 283-284 (603 SE2d 764) (2004); *In the Interest of R. S. H.*, 269 Ga. App. 292, 298 (a) (603 SE2d 675) (2004); *In the Interest of S. L. B.*, 265 Ga. App. 684, 688 (1) (595 SE2d 370) (2004); *In the Interest of J. J.*, 259 Ga. App. 159, 165 (575 SE2d 921) (2003); *In the Interest of D. S.*, 247 Ga. App. 569, 573 (545 SE2d 1) (2001); *In the Interest of K. L.*, 234 Ga. App. 719, 722-723 (507 SE2d 542) (1998); *In the Interest of K. S. W.*, supra at 149 (3).

[21] See *In the Interest of A. T.*, 271 Ga. App. 470, 474 (610 SE2d 121) (2005); *In the Interest of T. P.*, 270 Ga. App. 700, 706 (4) (608 SE2d 43) (2004); *In the Interest of R. S.*, 255 Ga. App. 756, 761 (566 SE2d 461) (2002) (physical precedent only); *In the Interest of D. F.*, 251 Ga. App. 859, 862 (555 SE2d 225) (2001); *In the Interest of K. J.*, 226 Ga. App. 303, 307-309 (2) (b) (486 SE2d 899) (1997).

[22] See *McCollum v. Jones*, 274 Ga. App. 815, 823-824 (3) (a) (3) (619 SE2d 313) (2005) (physical precedent only); *In the Interest of J. T. W.*, 270 Ga. App. 26, 36-37 (2) (d) (606 SE2d 59)

recognized that the two lines of cases conflict.[23] It is time to resolve this issue and to provide clarity to the bar and the public whose rights are thereby affected.

I believe the better practice is to require a specific showing of harm to the child, as "it is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child. Otherwise, the fourth part of the test would have no meaning."[24] Thus, although evidence establishing continued deprivation may also show harm under a particular set of facts, such a finding is not automatic. To the extent prior cases may be read to hold that a finding of continuing deprivation is enough to prove that the child will be harmed by the deprivation, without requiring a specific finding of harm, I would disapprove them.[25]

In this case, however, I agree with the majority that the juvenile court did make specific findings which were sufficient to justify its conclusion that continued deprivation would cause serious mental, emotional and moral harm to the children.[26] I therefore concur in the judgment affirming the juvenile court's termination of the mother's parental rights to J. K. and J. K. II.[27]

I am authorized to state that Presiding Judge Johnson, Judge Ellington, and Judge Adams join in this special concurrence.

DECIDED MARCH 30, 2006.

*Linda S. McKinley*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, John P. Cheeley, Lawrence L. Washburn III*, for appellee.

---

(2004); *In the Interest of J. H.*, 258 Ga. App. 211, 216 (573 SE2d 481) (2002); *In the Interest of J. M.*, 251 Ga. App. 380, 383-384 (4) (554 SE2d 533) (2001).

[23] See *In the Interest of J. T. W.*, supra; *In the Interest of L. G.*, supra at 475 (2) (d) (noting divergent case law).

[24] *In the Interest of J. T. W.*, supra at 37 (2) (d).

[25] We recognize that some cases, while citing the language of *In the Interest of K. S. W.*, supra, that suggests no separate finding of likely harm is necessary, in fact do make such a separate finding. We would disapprove these cases only to the extent they may be read to hold that no separate finding is needed.

[26] See *In the Interest of P. L. S. D.*, 275 Ga. App. 49, 52 (a) (4) (619 SE2d 755) (2005); *In the Interest of L. G.*, supra at 475-476 (2) (d).

[27] See id.; *In the Interest of A. S. H.*, 239 Ga. App. 565, 570-571 (1) (521 SE2d 604) (1999).