A06A0287, A06A0288. IN THE INTEREST OF D. J. et al., children (two cases).
(631 SE2d 427)

PHIPPS, Judge.
In Case Nos. A06A0287 and A06A0288, the father and mother, respectively, contest the termination of their parental rights under OCGA § 15-11-94 to D. J. and W. J. For reasons that follow, we affirm both cases.

Terminating parental rights pursuant to OCGA § 15-11-94 requires a court to employ a two-step procedure. The first step requires the court to determine whether there is present clear and convincing evidence of parental misconduct or inability.[1] Parental misconduct or inability is found where (1) the child is deprived; (2) the lack of proper parental care or control by the parent in question is the cause of the child's deprivation; (3) the cause of deprivation is likely to continue or will not likely be remedied; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or

---

moral harm to the child.[2] The second step of the procedure requires the court to determine whether termination of parental rights is in the child's best interest.[3]

D. J. was born in February 1999. In October 2002, he was removed from his parents' home and placed in the home of his paternal grandmother. In February 2003, the juvenile court adjudicated him deprived, citing domestic violence between the parents in the child's presence, the mother's lack of employment, and her self-described depression and panic attacks. The court granted temporary custody of D. J. to his paternal grandmother and further ordered that reunification of the parents with D. J. required: (1) the parents to maintain for at least six months stable, suitable housing with sufficient space to meet the needs of the entire family; (2) the parents to maintain for at least six months gainful employment with income sufficient to meet the family's needs; (3) the parents to maintain meaningful contact with the child by complying with a visitation schedule to be set; (4) the parents to complete a parenting/nurturing class; (5) the parents to complete a psychological evaluation and follow recommended treatment; (6) the parents to complete a drug and alcohol assessment and follow any recommended treatment; (7) the parents to complete an anger management course; (8) the parents to complete marriage counseling, if they chose to remain together; (9) the father to pay child support in the amount of 20 percent of his gross income; and (10) the mother to pay the greater of 20 percent of her gross income or $45 per week.

Meanwhile, W. J. was born in October 2003. In February 2004, the Department of Family and Children Services (DFCS) received a report of domestic violence between the parents, during which episode the mother was holding the child and "busted a glass." It was also alleged that the parents had a history of drug use. DFCS immediately conducted a home visit, discovering broken glass and a knife on a bookshelf. DFCS removed W. J. from her home and placed her, pursuant to a safety plan, in her paternal grandparents' home. The mother submitted to a drug screen at DFCS's request, which was positive for methamphetamine.

Also, in February 2004, the couple divorced. The next month, the father went to DFCS and reported that the mother had attacked him and lacerated his ear. In April, the mother went to DFCS battered, with a swollen face and two black eyes, and attributed her injuries to the father.

---

[2] OCGA § 15-11-94 (b) (4) (A).
[3] OCGA § 15-11-94 (a).

DFCS subsequently filed a petition alleging that W. J. was deprived, and the court held a hearing. On September 23, 2004, the juvenile court adjudicated the child deprived, citing domestic violence between her parents in the child's presence and the detection of methamphetamine in the mother's February 2004 drug screen. The court awarded temporary custody and control of W. J. to her paternal grandparents.

On January 21, 2005, the children's paternal grandparents petitioned to terminate the mother's and father's parental rights to D. J. and W. J. on grounds of parental misconduct or inability as provided in OCGA § 15-11-94. Specifically, petitioners alleged that the children were without proper parental care or control; the parents had failed to comply with court-ordered requirements of reunification; there was domestic violence between the parents; the parents had failed to contribute to the financial support of the children; the parents abused drugs; the parents had failed to maintain regular contact with the children; the children were in a stable, loving home; and the petitioners wished to adopt the children. They sought permanent custody of D. J. and W. J. In June 2005, the court held a hearing and granted the petition.

## Case No. A06A0287

1. In his sole claim of error, the father complains that the juvenile court allowed the petitioners to call him as an adverse witness, subject to cross-examination.[4] He argues that in parental rights termination hearings, permitting a petitioner to call the parent as an adverse witness, subject to cross-examination, deprives the parent of due process in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section I, Paragraph I of the Constitution of the State of Georgia. Recently, however, this court considered and rejected that argument.[5] Thus, we affirm the termination of the father's parental rights to both children.

## Case No. A06A0288

2. The mother contends that the termination of her parental rights to D. J. was not supported by sufficient evidence. On appeal, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found

---

[4] See OCGA § 24-9-81.
[5] *In the Interest of A. R. A. S.*, 278 Ga. App. 608 (1) (629 SE2d 822) (2006).

by clear and convincing evidence that the parent's rights should have been terminated.[6] So viewed, the evidence was sufficient.

(a) The juvenile court's order finding by clear and convincing evidence that D. J. was deprived was not appealed. Therefore, the mother is bound by that finding.[7]

(b) In determining whether a child is without proper parental care and control, a court shall consider, without being limited to, the excessive use of or a history of chronic unrehabilitated abuse of narcotic drugs with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child;[8] and the physical, mental, or emotional neglect of the child or of another child by the parent.[9] Where a child is not in the parent's custody, the court must also consider whether the parent unjustifiably and significantly for one year or longer prior to the filing of the termination petition failed to: (i) develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) provide for the care and support of the child as required by law or judicial decree; and (iii) comply with a court-ordered plan designed to reunite the child with the parent.[10]

Evidence showed the excessive use of, or a history of chronic unrehabilitated abuse of, a narcotic drug by the mother that rendered her incapable of providing adequately for the child's needs. Since D. J.'s removal from his home, the mother had passed only two drug tests. She failed two, and all others to which she submitted were determined to have been "altered." The mother claimed that she had used methamphetamine with the father, but not since she became pregnant with D. J. Explaining the two positive test results, she claimed that the father had administered her the drug without her knowledge. But the children's paternal aunt testified that she and the mother had "done drugs together ever since [the parents have] been together," eight or nine years, and as recently as six to eight weeks before the hearing.[11] On that last occasion, the aunt recounted, the mother had come to her residence with the drug, told her that she and the father had purchased it with money from their recent paychecks, and stayed at her residence several days smoking methamphetamine. In addition, although the mother had successfully completed two drug and alcohol assessments, she was expelled from the third such program the month of the hearing for lack of attendance.

---

[6] In the Interest of T. J. J., 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

[7] See In the Interest of B. N. S., 259 Ga. App. 622, 623 (578 SE2d 242) (2003).

[8] OCGA § 15-11-94 (b) (4) (B) (ii).

[9] OCGA § 15-11-94 (b) (4) (B) (v).

[10] OCGA § 15-11-94 (b) (4) (C).

[11] This witness was shown to have been convicted for marijuana possession.

Evidence showed that the mother had neglected D. J. and failed to develop and maintain a parental bond with him. In an order subsequent to its deprivation order, the juvenile court set supervised visitations between the mother and D. J. every other Saturday at the home of D. J.'s maternal grandmother. But in the ten months before the termination hearing, the mother had not seen D. J. at all. She blamed her failure to do so on the child's paternal grandmother. The grandmother admitted that she had refused to permit the mother to visit D. J., explaining that she had reason to believe that the mother was still using methamphetamine. The grandmother testified that the mother had once shown her the drug and complained that "this is where [the father's] money's going." Concerned for D. J.'s safety, the grandmother agreed to permit the mother to spend time with D. J. only if the mother presented results of a drug test showing the presence of no illegal drug. The mother never provided the grandmother with such results. The grandmother never again permitted the mother visitation with D. J. And the mother did nothing to enforce her visitation rights under the court's order.

Evidence showed that the mother failed to support D. J. financially. The mother testified that she had paid no child support for D. J. and that she had provided no food for him since he was three years old.

Evidence showed that the mother had significantly and unjustifiably failed to comply with the court-ordered reunification plan. The requirements of the mother's plan with respect to D. J. are set forth above. The mother asserts that she met several of the required goals, pointing to her certificate of completion of a parenting class, her certificate of completion of an anger management class, and her testimony that she had completed a psychological evaluation that recommended no follow-up treatment.

The mother also asserts that she complied with the goal of maintaining for six months stable, suitable housing, citing evidence that she had lived with her mother from February 2004 until about four months prior to the hearing, when she moved to a separate residence. Notwithstanding, there was strong evidence weighing against the mother's assertion that this residence constituted a stable, suitable home for D. J. The mother testified that the father had moved into that residence with her, that she loved him, and that they were contemplating reconciling as a couple. Notably, the plan to reunite the parents with their children required them to complete marriage counseling if they planned to remain as a couple. They had not begun any such counseling. Moreover, the father admitted that he had used methamphetamine since a teenager and had used it as recently as a few months before the hearing. He also admitted that he had failed to complete all requirements set forth in the case plan,

which included obtaining drug treatment and completing a parenting class, a drug and alcohol assessment, and an anger management class.

Evidence showed that the mother had failed to maintain six months of gainful employment with income sufficient to meet the family's needs. In 2003, she did not work at all. For the year 2004, she could not recall much of her work history. She testified that during the ten months before the hearing, she had started but quit at least three different jobs, with her periods of employment varying from two to four months. As of the date of the hearing, the mother was working one job paying $5.50 per hour; serving as a confidential drug informant earning "$100 a pop"; and working part-time for her father making approximately $20 to $100 each week. The mother testified that the combined income of these jobs, however, had been insufficient to enable her to financially support either D. J. or W. J.

Based on all of the above, viewed in the light most favorable to the juvenile court's determination, a rational trier of fact could have found by clear and convincing evidence that D. J.'s deprived status was caused by the mother's lack of proper parental care or control.[12]

(c) A rational trier of fact could have found by clear and convincing evidence that the cause of the deprivation was likely to continue.[13] In determining whether the conditions that caused the child's deprivation are likely to continue, a court may consider a parent's past conduct.[14] During the last three years of D. J.'s then six-year life, the mother essentially abandoned care of the child. In addition, she had failed unjustifiably and significantly to comply with the directives of the plan designed to reunite her with her son. Moreover, the mother had effectively reassembled in her home the very circumstances that had initially contributed significantly to the child's deprivation.

(d) The same evidence that authorized the juvenile court to determine that D. J. was deprived due to lack of proper parental control or parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support that such continued deprivation would likely have caused serious physical, mental, emotional, or moral harm to the child.[15]

---

[12] See *In the Interest of A. R. A. S.*, supra at 612-614 (2).

[13] *In the Interest of M. E. M.*, 272 Ga. App. 451, 454-455 (612 SE2d 612) (2005); *In re B. N. S.*, supra at 624-625.

[14] *In the Interest of M. E. M.*, supra at 454.

[15] See *In the Interest of J. K.*, 278 Ga. App. 564, 566-567 (1) (629 SE2d 529) (2006) (recognizing that although the four factors determining parental misconduct or inability are separately listed in OCGA § 15-11-94 (b) (4) (A), "often they overlap, thus allowing evidence displaying one of the criteria to prove or at least partially prove one or more of the other criteria"); see also *In the Interest of M. E. M.*, supra at 455; *In the Interest of L. G.*, 273 Ga. App. 468, 475 (2) (d) (615 SE2d 551) (2005) ("where evidence showed no parental bond between

(e) Clear and convincing evidence showed that termination of the mother's parental rights to D. J. was in the child's best interest.[16] Evidence that showed the mother's parental misconduct or inability also supported the juvenile court's finding that termination of her parental rights was in the child's best interest.[17] To adequately mature and develop, children are in need of stability and permanence in their environment.[18] Yet, the mother demonstrated an unwillingness or inability to provide for D. J. Since about age three, D. J. lived with his paternal grandparents, who had taken sole responsibility for caring for him and, later, his sister W. J. The paternal grandmother testified that she and her husband already enjoyed a parental bond with the children, were capable of providing them a stable, permanent home, and intended to adopt them. D. J.'s teacher testified that D. J.'s grandparents had been extremely supportive of him concerning school work and other activities, that D. J. had developed and excelled in her class, and that his grandparents had played a major role in his growth and success during the school year. The guardian ad litem opined that, given the mother's history and failure to comply with the reunification plan and the grandparents' love, support, and adoption plans, termination of the mother's parental rights was in the best interests of D. J., as well as his sister, W. J.

3. The mother contends that the termination of her parental rights to W. J. was not supported by sufficient evidence. Viewing the evidence in the light most favorable to the juvenile court's determination, we cannot agree.

(a) The juvenile court's order adjudicating W. J. deprived, based on a finding of clear and convincing evidence, was not appealed. Accordingly, the mother was bound by that finding for purposes of the termination proceeding.[19]

(b) As stated above, in determining whether a child is without proper parental care and control, the court is required to consider certain factors, such as a drug abuse problem and emotional neglect of the child or another child by the parent.[20] In addition, because W. J. had been removed from her mother's custody, the court was required to consider any unjustified, significant failure for at least one year prior to the filing of the termination petition to accomplish the factors

---

parent and child, the child had adapted well to foster care, and the foster parent wished to adopt, this was sufficient to support the juvenile court's conclusion that continued deprivation was likely to harm the child") (citations and punctuation omitted).

[16] See *In the Interest of M. E. M.*, supra at 451-456; *In the Interest of J. K.*, supra.

[17] See *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005); *In the Interest of M. E. M.*, supra at 456.

[18] See *In the Interest of M. E. M.*, supra at 456.

[19] See *In the Interest of R. G.*, 249 Ga. App. 91, 93 (1) (a) (547 SE2d 729) (2001).

[20] OCGA § 15-11-94 (b) (4) (B) (ii), (v).

listed as subparagraphs of OCGA § 15-11-94 (b) (4) (C): (i) develop and maintain a parental bond with W. J. in a meaningful, supportive manner; (ii) provide for W. J.'s care and support as required by law or judicial decree; and (iii) comply with "a court ordered plan designed to reunite the child with the parent. . . ."[21]

At the hearing, evidence was adduced that DFCS had given the mother several reunification plans, the last of which, dated August 31, 2004, listed goals for the mother to become drug free, provide for the basic needs of W. J., and address domestic violence issues. On appeal, the mother points out that, in terminating her parental rights to W. J., the juvenile court cited her failure to comply with a reunification plan. She argues that the court's reliance on any noncompliance was error because no plan designed to reunite her with W. J. had been court-ordered.[22]

> While it was inappropriate for the [juvenile] court to consider this failure due to the fact that the reunification order had [neither] been in effect for one year [nor been court-ordered], under the facts of this case, the error is not of such magnitude as to require reversal. By the clear language of the statute, the [juvenile] court is not limited to looking solely at subparagraph (b) (4) (C)'s factors. . . .[23]

Even without evidence that the mother failed to comply with a reunification plan, a rational trier of fact could have found by clear and convincing evidence that W. J.'s deprived status was caused by the mother's lack of proper parental care or control.[24] Evidence showed that the mother had neglected W. J. and failed for at least one year or longer prior to the filing of the termination petition to develop and maintain a parental bond with W. J. in a meaningful, supportive manner and to provide for W. J.'s care and support. Since the day W. J. was removed from her mother's custody, the mother provided neither financial support nor food for her. Georgia law requires a parent to

---

[21] OCGA § 15-11-94 (b) (4) (C).

[22] Although the court ordered DFCS to develop a plan to reunite W. J. with her biological father, it did not order DFCS to develop a plan to reunite the child with her mother.

[23] *In the Interest of A. M. B.*, 219 Ga. App. 133, 136 (464 SE2d 253) (1995) (whole court); see further *In the Interest of V. S.*, 230 Ga. App. 26, 30-31 (2) (495 SE2d 142) (1997).

[24] Compare *In the Interest of B. N. A.*, 248 Ga. App. 406, 410-411 (1) (546 SE2d 819) (2001) (where father had no opportunity to comply with a reunification plan because DFCS never established the plan as court-ordered and only six months elapsed between time juvenile court entered its order requiring the plan and time of the termination hearing, termination was reversed; and father's previous drug offense conviction, current criminal charges, and lack of greater initiative in reuniting himself with his child was not clear and convincing evidence that his lack of proper parental care or control was causing, and would continue to cause, his child's deprivation).

support his or her child, even absent a court order.[25] During the ten months prior to the hearing, the mother had not visited W. J. Evidence showed that the mother had physically, mentally, and emotionally neglected another of her children, D. J.[26] Evidence described in Division 2 (b)[27] showed that the mother's excessive use of and chronic, unrehabilitated abuse of methamphetamine rendered her incapable of providing adequately for the needs not only of D. J., but also of W. J.[28]

(c) A rational trier of fact could have found by clear and convincing evidence that the cause of W. J.'s deprivation was likely to continue, given the mother's past conduct;[29] the fact that during all but three months of W. J.'s then 19-month life, the mother had essentially abandoned her care; and the mother's return to circumstances that had initially contributed significantly to W. J.'s deprivation.

(d) The same evidence that authorized the juvenile court to determine that W. J. was deprived due to lack of proper parental control or to parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation would have likely caused serious physical, mental, emotional, or moral harm to W. J.[30] Further supporting this determination was evidence that W. J. had no parental bond with her mother, that she had adapted well in the care of her grandparents, and that they wished to adopt her.[31]

(e) Given W. J.'s need for stability and permanence in her environment,[32] the mother's failure to demonstrate a willingness or ability to provide for W. J., the parental bond between W. J. and her paternal grandparents, her grandparents' plan to adopt her and her brother, and the testimony of the guardian ad litem, there was clear and convincing evidence that termination of the mother's parental rights to W. J. was in the child's best interest.[33]

*Judgments affirmed. Ruffin, C. J., and Smith, P. J., concur.*

---

[25] See *In the Interest of A. R. A. S.*, supra at 613 (2) (c); OCGA § 19-7-2 (general duty to support); *In the Interest of J. J.*, 259 Ga. App. 159, 162 (575 SE2d 921) (2003) ("A parent . . . has a statutory duty to support her children, with or without a court order.").

[26] See OCGA § 15-11-94 (b) (4) (B) (v).

[27] Supra.

[28] See OCGA § 15-11-94 (b) (4) (B) (ii).

[29] See *In the Interest of M. E. M.*, supra at 454 (court may consider parent's past conduct).

[30] See id. at 455; see *In the Interest of J. K.*, supra (regarding overlapping evidence).

[31] See *In the Interest of L. G.*, supra.

[32] See *In the Interest of A. B.*, supra; *In the Interest of M. E. M.*, supra at 456.

[33] See *In the Interest of M. E. M.*, supra at 451-456.

DECIDED MAY 12, 2006 —

*Michael S. Webb*, for appellant (case no. A06A0287).
*Bruce A. Kling*, for appellant (case no. A06A0288).
*Rodney Q. Quarles, Philip F. Woodward*, for appellee.